UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COCA-COLA BEVERAGES NORTHEAST, INC.<br><br>　　　　　Plaintiff<br><br>v.<br><br>LOCAL UNION NO. 170 OF THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS,<br><br>　　　　　Defendant | Case No. |

**COMPLAINT**

　　　　This is an action brought by Coca-Cola Beverages Northeast, Inc. ("CCBNE") pursuant to the Federal Arbitration Act, 9 U.S.C. § 1, *et seq*. and Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 *et. seq*., to vacate an arbitrator's award, which the Arbitrator issued in excess of the powers CCBNE and the Local Union No. 170 of the International Brotherhood of Teamsters ("Union", collectively, the "Parties"), granted to her in their Collective Bargaining Agreement. The Arbitrator's award created new and additional requirements that the Parties did not expressly provide in their Collective Bargaining Agreement, and which are devoid of rational support or derivation from the terms of the Collective Bargaining Agreement. The Arbitrator ignored the express terms of the Parties' Collective Bargaining Agreement which assigned disciplinary discretion to CCBNE and prohibited the Arbitrator from substituting her judgment for that of CCBNE when she ordered the reinstatement of a terminated employee who CCBNE terminated for theft, records falsification, and dishonesty.

## I.      JURISDICTION & VENUE

1. This Court has jurisdiction over this matter pursuant to Section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185, and 28 U.S.C. § 1331.

2. Venue is proper in this District pursuant to 29 U.S.C. § 185 and 28 U.S.C. § 1391 because the subject matter of the grievance to which the arbitration award at issue relates arose within Massachusetts; the subject matter of the grievance concerns an employee who resides in Massachusetts and was employed at CCBNE's Westborough, Massachusetts Sales Center; the Union maintains its principal office in Worcester, Massachusetts; and the Union's duly authorized officers or agents are engaged in representing or acting for employee members in Massachusetts.

## II.      PARTIES

3. Coca-Cola Beverages Northeast, Inc. is a Delaware corporation with a principal place of business at 1 Executive Park Drive, Suite 330, Bedford, New Hampshire, 03110.

4. Local Union No. 170 of the International Brotherhood of Teamsters is an unincorporated labor organization within the meaning of 29 U.S.C. § 185 and represents employees in an industry affecting interstate commerce. The Union maintains a principal office at 330 Southwest Cutoff, Suite 201, Worcester, Massachusetts 01604.

## III.      FACTS

5. CCBNE has owned and operated a sales center located at 2 Sassacus Drive, Westborough, Massachusetts since September 29, 2017 ("Westborough Sales Center").

6. The Union represents a bargaining unit at the Westborough Sales Center that includes Jose Calderon as a member.

### A. The Collective Bargaining Agreement

7. CCBNE and the Union are parties to a collective bargaining agreement that provides for the terms and conditions of employment for bargaining unit employees, including Mr. Calderon (hereinafter the "Collective Bargaining Agreement"). A true and accurate copy of the Collective Bargaining Agreement (effective February 1, 2021, to January 31, 2024) is attached hereto as **Exhibit A**.

8. Article 18 of the Collective Bargaining Agreement addresses procedures for discipline and discharge of employees in all cases except attendance, which is separately addressed by Article 13.

9. Article 18 provides:

> Employees may be discharged for proper cause.  **Employees engaging in the following offenses will be deemed to have been discharged for proper cause**: Use, possession or sale of drugs and/or alcohol, fighting, **theft**, willful insubordination, willful damage of company property, **willful falsification of company documents**, possessing or carrying of dangerous weapons or firearms on company property, failure to report a vehicle or industrial accident, punching of another employee's timecard.  **The above list represents the most common situations or offenses that warrant discharge without a warning notice, but is not intended to be exhaustive.**  The Union shall be notified promptly of any discharge and representatives of the Union shall have the right to investigate.

**Ex. A**, Art. 18.3 (emphasis supplied).

10. The Collective Bargaining Agreement does not require CCBNE to utilize progressive discipline prior to termination, except as required by Article 13 to address attendance issues, which are not relevant to this matter.

11. The Collective Bargaining Agreement further permits CCBNE to "to promulgate and enforce reasonable shop safety and Company rules of all kinds, and to enforce penalties for their violations and to take such measures as management may determine to be necessary for the orderly, efficient and profitable operation of the business." **Ex. A**, Art. 4.1.

12. The Collective Bargaining Agreement includes a grievance and arbitration process should, for example, CCBNE and the Union disagree on whether a discharge is supported by proper cause under Article 18.  **Ex. A**, Art. 19.

13. If the grievance procedure set forth in the Collective Bargaining Agreement does not successfully resolve a dispute between the Parties, the Parties may submit that dispute to arbitration.  **Ex. A**, Art. 19.3.

14. An arbitrator adjudicating a grievance under the Collective Bargaining Agreement may "interpret the Agreement and apply it to the particular case presented to him, but he shall not have the authority to add to, subtract from, or modify the terms of this Agreement or of any supplemental agreement reached between the parties."  **Ex. A**, Art. 19.4.

### B. CCBNE's Rules

15. Pursuant to its authority under Article 4.1 of the Collective Bargaining Agreement, CCBNE promulgated a set of employee rules and regulations for on-the-job conduct ("Work Rules").  A true and accurate of the Work Rules is attached hereto as **Exhibit B**.

16. The Work Rules repeatedly stress the importance of honesty, stating, "We expect Coca-Cola employees to be conscientious, reliable and honest . . ." (**Ex. B**, at *1); "We expect you to be completely honest and truthful in all of your dealings with you co-workers, your supervisors, the Company's customers, and the Company." (**Ex. B**, at *2); and generally reinforcing the negotiated language in Article 18 of the Collective Bargaining Agreement that honesty-related offenses, such as "falsifying work records," are subject to discharge for a first offense (**Ex. B** at *5).  The Work Rules further specify, again consistent with the Collective Bargaining Agreement, that discharge is appropriate for a first offense of "Theft or embezzlement from company, customer or employees."  *Id.*

17. Even in the absence of explicit Work Rules, it is fundamental to the employer-employee relationship that an employer expects an employee, especially an hourly employee, to be physically present where he performs work and be actually working while clocked in and representing himself through his time entries and other records as working and then accepting pay for doing so.

### C. CCBNE Discharges Jose Calderon

18. CCBNE hired Jose Calderon as a Merchandiser when it purchased the Westborough Sales Center on September 29, 2017.

19. Merchandisers, including Mr. Calderon, primarily work without direct supervision, spending most days away from the Westborough Sales Center and working at the various retail stores that sell CCBNE's products.

20. The Company requires Merchandisers to document their activities by making an electronic record on a company-issued phone, detailing time entries, breaks, and work activities throughout each workday.

21. In the course of negotiations that resulted in the Collective Bargaining Agreement, the bargaining unit, including Mr. Calderon, engaged in a strike from March 15, 2021, through March 30, 2021.

22. Other than being generally aware of his role as a steward and a member of the bargaining committee, CCBNE is unaware of what role, if any, Mr. Calderon played in internal Union deliberations in the lead-up to and execution of the strike.

23. On April 2, 2021, Coke Northeast and the Union signed a strike settlement agreement as part of entering into the Collective Bargaining Agreement, retroactive to February 1, 2021.

24. Following the strike, Coke Northeast prioritized conciliation and the returning strikers largely reintegrated into their jobs without issue or incident.

25. On April 6, 2021, however, Seedi Sheriff, a supervisor and former Merchandiser himself, observed Mr. Calderon sit in his vehicle for approximately 20 minutes even though Mr. Calderon created a Company work record that he was clocked in and physically working inside the retail store to which he was assigned.

26. On April 8, 2021, Tarini Eshwariah, another supervisor who on that day was filling in as an Account Manager, could not locate the Merchandiser who was supposed to be in a retail account that CCBNE assigned to her. Upon investigation, she determined that the Merchandiser was Mr. Calderon and she caught Mr. Calderon returning to work 12 minutes late from his break. Similar to April 6, Mr. Calderon's work record entries indicated he was clocked in and physically working inside the retail store. Ms. Eshwariah verbally confronted Mr. Calderon regarding this theft of time.

27. Both Mr. Sheriff and Ms. Eshwariah reported these incidents to their manager, Meaghan Jennison, and CCBNE began an investigation.

28. In the course of its investigation, CCBNE hired a private investigation company to observe Mr. Calderon's activities during his working hours.

29. Alliance Risk Group, Inc. conducted surveillance during Mr. Calderon's working hours activities on May 5, 7, 8, 14, 15, and 22, 2021.

30. Three patterns emerged: first, Mr. Calderon represented himself as working by consistently punched in and out of work earlier and later than CCBNE authorized; second, on multiple days Mr. Calderon had significant blocks of time during which he falsely created Company records to claim he was physically working but was neither physically present where he

was to perform work nor actually working; and, third, Mr. Calderon submitted his falsified time entries as the basis for which CCBNE would pay him, thus committing theft.

31. This investigation uncovered a minimum of 27 additional discrete instances of time theft in addition to the two discovered by Seedi Sheriff and Tarini Eshwariah, amounting to 29 discrete instances where Mr. Calderon's timecards/record entries did not match his activities.

32. The length of these instances varied, but in perhaps the most egregious example, on May 7, 2021, Mr. Calderon finished his work for the day but nonetheless he did not clock out and instead, continued to represent himself through his time entries and other records as physically present and actively performing work inside a retail store for 52 minutes during which he sat in his car and performed no work. He then clocked out and ended his purported workday.

33. Because Mr. Calderon falsified time entries in this and other instances and submitted those records to CCBNE, CCBNE compensated him for his time, including paying him at the rate of time and one half, even though he had already ended his actual work day and was physically outside the place where his work was performed.

34. All told, over the six days of observation, plus two other instances observed by supervisors, the false entries made by Mr. Calderon and for which CCBNE paid him amounted to at least 331 minutes, or over 5 1/2 hours of time.

35. On May 27, 2021, CCBNE managers interviewed Mr. Calderon regarding these false entries and presented him with a summary of the evidence it had collected up to that point. For some of the instances, Mr. Calderon was not able to provide an explanation.

36. Rather than take any responsibility for any wrongdoing whatsoever, Mr. Calderon repeatedly lied during the interview in ways that CCBNE was able to easily disprove.

37. For example, Mr. Calderon identified certain specific incidents being due to "mask breaks" allegedly authorized by a supervisor Mr. Calderon could not name. In fact, other than contractual breaks set forth in the Collective Bargaining Agreement, no other authorized breaks exist.

38. Mr. Calderon decided to take several of these alleged "mask breaks" before beginning starting work for the day. The Parties in their Collective Bargaining Agreement expressly prohibit such a break.

39. Following that interview, CCBNE suspended Mr. Calderon pending further investigation.

40. On May 28, 2021, CCBNE informed Mr. Calderon that it was terminating his employment, "[a]s the result of an investigation which included a review with you of the information gathered regarding theft of time." A true and accurate copy of CCBNE's correspondence to this effect is attached hereto as **Exhibit C**.

41. The Union grieved Mr. Calderon's discharge and the Parties submitted the grievance to arbitration for determination by Arbitrator Beth Ann Wolfson.

### D. The Arbitration Proceeding and Award

42. The arbitration hearing took place over two days on October 26 and November 22, 2021, before Arbitrator Wolfson.

43. The Parties stipulated to the following issue: "Did the Company have proper cause to terminate the Grievant? If not, what shall the remedy be?"

44. "Proper cause" is a term expressly defined by Article 18.3 of the Collective Bargaining Agreement, which definition the Arbitrator was required to apply.

45. On February 10, 2022, Arbitrator Wolfson issued a decision finding that Mr. Calderon committed misconduct warranting discipline, but nonetheless ordered CCBNE to reinstate Mr. Calderon and reduce his discipline to a written warning. A true and accurate copy of the Arbitration Award is attached as **Exhibit D**.

46. Arbitrator Wolfson, despite drawing almost all factual inferences in Mr. Calderon's favor, nonetheless found that he had violated CCBNE's Work Rules multiple times.

47. Per Arbitrator Wolfson's findings, Mr. Calderon conducted personal business, predominantly in parking lots, for 132 minutes, or 2.2 hours, while he continued to represent himself through his time entries and other records as physically present and actively performing work inside a retail account on the days that he was observed. **Ex. D** at **25-27. Arbitrator Wolfson excluded the days that Mr. Calderon was observed by Mr. Sheriff and Ms. Eshwariah in these calculations, despite the Union not disputing these instances in the arbitration, as well as other days and instances placed in evidence by refusing to consider time stamped video recordings of Mr. Calderon's activities.

48. Even having excluded many of Mr. Calderon's individual instances of falsification and theft, Arbitrator Wolfson nonetheless concluded that on at least one instance Complainant sat in his car, doing nothing for 41 minutes while clocked in and representing himself through his time entries and other records as physically present and actively performing work inside a retail account. **Ex. D** at *25.

49. In total, Arbitrator Wolfson found that 9 separate and discrete instances of Mr. Calderon not working while representing himself through his time entries and other records as physically present and actively performing work on Company time were supported by the evidence. **Ex. D** at **25-27.

50. Several of these instances that the Arbitrator wrongly characterized as interrupting the workday occurred before Mr. Calderon began work for the day or after Mr. Calderon concluded work for the day.

51. The Arbitrator further found that five of these instances, those occurring on May 7 and May 8, merited discipline, holding "The Employer did have proper cause to issue a written warning to Grievant for excessive interruption of work for personal business and/or personal phone calls on May 7 and 8, 2021." **Ex. D** at *29.

52. Arbitrator Wolfson further found that the evidence discredited Mr. Calderon's claims to CCBNE that he was taking "mask breaks" during the discrepancies **Ex. D** at *27, fn. 10.

53. Arbitrator Wolfson also found that Mr. Calderon was aware of the Work Rules. **Ex. D** at *28.

54. Arbitrator Wolfson then exceeded her authority, acted in manifest disregard of the contract, and overruled CCBNE's business judgment in coming to the irrational conclusion, without any substantive explanation, that Mr. Calderon's misconduct, even though she found it to have occurred, did not constitute theft or falsification of CCBNE's time records. **Ex. D** at *27.

55. Having come to this conclusion, Arbitrator Wolfson then further exceeded her authority in denouncing the applicability of the Collective Bargaining Agreement, which applies to all terminations, to Mr. Calderon's termination, holding, "Contrary to the Employer's assertion, therefore, the resolution of this matter is not governed by either Article 18.3 or its Work Rules concerning theft." **Ex. D** at *27.

56. Arbitrator Wolfson continued to exceed her authority by refusing to apply CCBNE's Work Rules as written. **Ex. D** at **27-28.

57. Arbitrator Wolfson ignored that the Collective Bargaining Agreement explicitly provides management exclusive power to "enforce reasonable . . . Company rules of all kinds, and to enforce penalties for their violations, and to take such measures as management may determine to be necessary for the orderly, efficient and profitable operations of the business." **Ex. A**, Art. 4.1.

58. Specifically, Arbitrator Wolfson held, "Because Grievant did not engage in theft, but did engage in conduct violating an Employer Work Rule that calls for progressive discipline, and because according to the record evidence Grievant, a 24-year employee, had not previously been disciplined, I conclude a written warning is appropriate." **Ex. D** at *28. In so deciding, Arbitrator Wolfson failed to correctly apply the Work Rule.

59. In interpreting the "disciplinary action schedule" contained in the Work Rules to impose progressive discipline obligations on CCBNE, Arbitrator Wolfson "added to" and "modified" the terms of the Collective Bargaining Agreement, as prohibited under Article 19.4. **Ex. A**, Art. 19.4.

60. Assuming that the "disciplinary action schedule" was binding on CCBNE under the contract, Arbitrator Wolfson further modified it in violation of the Collective Bargaining Agreement when she mandated a written warning for the nine offenses that she found Mr. Calderon to have committed.

61. Even were Arbitrator Wolfson acting within her authority in imposing an alleged progressive discipline requirement on CCBNE, she exceeded her authority in finding that Mr. Calderon's misconduct merited a written warning where the Work Rules call on CCBNE to warn an employee in writing for a second offense and discharge an employee for a fourth offense of "Excessive interruption of work for personal business, personal phone calls, and/or personal visits by or to other employees" given that she found that Mr. Calderon had committed at least five separate offenses meriting discipline.

62. In her findings, the Arbitrator imposed the discipline that she believed appropriate and substituted her judgment for the judgment of CCBNE to dispense her own brand of industrial justice, in explicit disregard of the Parties' contract.

## COUNT I

63. CCBNE re-alleges and incorporates paragraph 1-62 of this Complaint as if fully set forth herein.

64. Arbitrator Wolfson's Award exceeded her powers under the Collective Bargaining Agreement.

65. Arbitrator Wolfson's Award does not draw its essence from the Collective Bargaining Agreement.

66. Arbitrator Wolfson's Award is without rational support and cannot be rationally derived from the terms of the Collective Bargaining Agreement.

67. Accordingly, this Court should vacate the Award pursuant to the Federal Arbitration Act, 9 U.S.C. § 10(a)(4).

## COUNT II

68. CCBNE re-alleges and incorporates paragraph 1-67 of this Complaint as if fully set forth herein.

69. Arbitrator Wolfson's Award substituted her own judgment for that of CCBNE and dispensed her own brand of industrial justice in place of the terms of the Collective Bargaining Agreement.

70. Accordingly, this Court should vacate the Award pursuant to the Labor Management Relations Act, 29 U.S.C. § 185 *et. seq.*.

## COUNT III

71. CCBNE re-alleges and incorporates paragraph 1-70 of this Complaint as if fully set forth herein.

72. Arbitrator Wolfson's Award is unfounded in reason and fact.

73. Arbitrator Wolfson's Award is based on reasoning so palpably faulty that no judge, or group of judges, could ever conceivably have made such a ruling.

74. Arbitrator Wolfson, in articulating her Award, expressly stated that she considered and expressly disregarded the authorities by which she was bound.

75. Because Arbitrator Wolfson acted in manifest disregard of the law, this Court should vacate the Award.

WHEREFORE, Coca-Cola Beverages Northeast, Inc. respectfully requests that:

a. This Court enter a judgment vacating the Award or modifying the Award to conform to the requirements of the Agreement and applicable law.

b. This Court grant Plaintiff such other and further relief as may be just and proper.

Dated: March 8, 2022

Respectfully submitted,

Coca-Cola Beverages Northeast, Inc.,

By their attorneys,

*/s/ Peter Bennett*
Peter Bennett, Esq., BBO 669083
pbennett@thebennettlawfirm.com
Pawel Binczyk, Esq., BBO 682613
pbinczyk@thebennettlawfirm.com
THE BENNETT LAW FIRM, P.A.
75 Market Street, Suite 201
Portland, ME  04101
207.773.4775 (Telephone)
207.774.2366 (Facsimile)